# Deborah Price

Page 1

```
 1        IN THE UNITED STATES DISTRICT COURT FOR
 2              THE DISTRICT OF MARYLAND
 3                  NORTHERN DIVISION
 4    --------------------------------+
                                      |
 5    MANOR CARE OF AMERICA, INC.,    |
                                      |
 6                    Plaintiff,      |
                                      |
 7            v.                      | Civil Action
                                      |
 8    PROPERTY & CASUALTY INSURANCE   | No. L02CV4206
                                      |
 9    GUARANTY CORPORATION,           | Pages 1-64
                                      |
10                    Defendant.      |
                                      |
11    --------------------------------+
12            Deposition of DEBORAH PRICE
13                 Baltimore, Maryland
14               Thursday, July 11, 2003
15                     1:35 p.m.
16
17
18
19
20    Reported by:  Brenda Hornstein
21    Job No.:  153873
```

Page 2

```
 1
 2
 3
 4
 5
 6              Thursday, July 11, 2003
 7                    1:35 p.m.
 8
 9
            Deposition of DEBORAH PRICE
10
      held at the offices of:
11
12
13      Whiteford, Taylor & Preston L.L.P.
14      210 W. Pennsylvania Avenue
15      Towson, Maryland 21204-4515
16      410-832-2000
17
18
19         Pursuant to notice, before Brenda
20    Hornstein, Certified Shorthand Reporter and
21    Notary Public in and for the State of Maryland.
```

Page 3

```
 1    APPEARANCES
 2
 3    On Behalf of the Plaintiff Manor Care of America, Inc.:
 4        Cooper & Walinski
 5        900 Adams Street
 6        Toledo, Ohio 43624
 7        419-241-1200
 8    BY:  Gerald R. Kowalski, Esquire
 9
10
11
12
13
14    On Behalf of the Defendant Property & Casualty
15     Insurance Guaranty Corporation:
16        Whiteford, Taylor & Preston, L.L.P.
17        Seven Saint Paul Street
18        Baltimore, Maryland 21202-1626
19        410-347-9471
20        email: amezzanotte@wtplaw.com
21    BY:  Albert J. Mezzanotte, Jr., Esquire
```

Page 4

```
 1                  C O N T E N T S
 2    EXAMINATION OF DEBORAH PRICE BY:          PAGE:
 3        Mr. Kowalski                            5
 4
 5
 6
 7                    EXHIBITS
 8            (included with transcript.)
 9    PRICE DEPOSITION EXHIBIT NO.               PAGE:
10     1        Answers to Interrogatories.        28
11     2        Response of Defendant Property
12              & Casualty Insurance Guaranty
13              Corporation to Plaintiff's Request
14              for Production of Documents.        28
15     3        Notice and Invoice for Assessment
16              approved at the annual meeting of
17              the board of directors on June 8,
18              1993, with attached documents.      28
19
20
21
```

1 (Pages 1 to 4)

# Deborah Price

Page 5

```
1    Thereupon,
2              DEBORAH PRICE
3    the Witness, called for examination by counsel for
4    the Plaintiff and, after having been sworn by the
5    notary, was examined and testified as follows:
6        EXAMINATION BY COUNSEL FOR THE PLAINTIFF
7    BY MR. KOWALSKI:
8        Q    State your name, please.
9        A    Deborah Price.
10       Q    What is your address Deborah, residence
11   address?
12       A    1000 Brightstone Drive, Apartment 202,
13   Baltimore, 21237.
14       Q    Are you employed?
15       A    Property & Casualty Insurance Guaranty
16   Corporation.
17       Q    How long have you worked there?
18       A    About 17 years.
19       Q    Have you ever had your deposition taken
20   before?
21       A    No.
```

Page 6

```
1        Q    Have you ever testified in court
2    before?
3        A    No.
4        Q    I'm going to ask you questions
5    pertaining to the lawsuit that we have filed.  If
6    you don't understand any of my questions, let me
7    know and I'll rephrase it, ask it again, or I'll
8    have the court reporter read it back from the
9    record.  Okay?
10       A    Um-hum.
11       Q    Try to keep your responses verbal and
12   yes or no so that we have a clear and accurate
13   record here today.  Okay?
14       A    Um-hum.
15       Q    If you need to take a break at any
16   time, let us know, and we'll accommodate you.
17   All right?
18       A    Yes.
19       Q    If you need to talk to Mr. Mezzanotte,
20   let us know, and we'll accommodate you as well.
21       A    Okay.
```

Page 7

```
1        Q    What is your job title?  What do you
2    call the organization you work for?
3        A    The Guaranty Corporation.
4        Q    If I say Guaranty Corporation, you'll
5    know that I mean your employer, the PCIGC?
6        A    Yes.
7        Q    What is your job title for the Guaranty
8    Corporation?
9        A    System administrator.
10       Q    And how long have you been the
11   assistant administrator?
12       A    System administrator.
13       Q    Oh, system administrator?
14       A    Yes.
15       Q    How long have you been the system
16   administrator?
17       A    I got, received that job title probably
18   about 10, 12 years ago.
19       Q    Tell me what you do as the system
20   administrator.
21       A    I oversee the computer projects; the
```

Page 8

```
1    programming.  I also do a lot of their accounting
2    work, the daily check issuing, monthly
3    reconciliations.
4        Q    Who is your boss at the Guaranty
5    Corporation?
6        A    Joseph Petr, P-E-T-R.
7        Q    What is his title?
8        A    Executive Vice President.
9        Q    Does he report to the board?
10       A    Yes.
11       Q    Before becoming the system
12   administrator, what job positions did you have at
13   the Guaranty Corporation?
14       A    When I first was employed at the
15   Guaranty Corporation, I worked with the surety
16   claims manager, data entry.
17            Soon thereafter, I started into the
18   computer project and then worked my way through
19   that and, also, then took over the accounting.
20       Q    Where did you work before coming to the
21   Guaranty Corporation?
```

2 (Pages 5 to 8,

## Deborah Price

Page 9

```
1      A    Point Breeze Credit Union.
2      Q    How long did you work there?
3      A    My goodness.  I think about three or
4  four years.
5      Q    And before that, where did you work?
6      A    For a security alarm company, Intrax
7  Electronic Security, I-N-T-R-A-X Electronic
8  Security.
9      Q    What is the extent of your formal
10 education?
11     A    Bachelor's degree.
12     Q    From where?
13     A    University of Baltimore.
14     Q    In what field?
15     A    Interdisciplinary studies.
16     Q    When did you get that degree?
17     A    1991.
18     Q    Have you ever worked in the field of
19 bodily injury claims?
20     A    No.
21     Q    How many other people are presently
```

Page 10

```
1  employed by the Guaranty Corporation?
2      A    Ten.
3      Q    Who in the Guaranty Corporation is
4  responsible for claim handling?
5      A    Doug Knight, Valerie Crest, and other
6  claims examiners.
7      Q    Two years ago, how many people were
8  employed by the Guaranty Corporation,
9  approximately?  Are there more today than there
10 were two years ago?
11     A    There are not more employees.
12     Q    Does the Guaranty Corporation contract
13 out any of its claims handling work?
14     A    I don't know.
15     Q    Do you have knowledge of the four types
16 of accounts that the Guaranty Corporation must
17 establish pursuant to the Maryland statute?
18     A    Yes.
19     Q    Is that one of your responsibilities,
20 to establish and maintain an account for the
21 funds in those accounts?
```

Page 11

```
1      A    Maintain an account?
2      Q    It's part of your job responsibility to
3  maintain an account for the funds that are in the
4  four statutory mandated accounts?
5      A    A bank account?
6      Q    Right.
7      A    Yes.
8      Q    Can you tell me how many claims have
9  been presented to the Guaranty Corporation as a
10 result of the PHICO, and that's P-H-I-C-O,
11 insolvency?
12     A    I, I couldn't off the top of my head.
13     Q    Is it more than 50?
14     A    Yes.
15     Q    Is it more than 100?
16     A    Yes.
17     Q    Is it more than 200?
18     A    Yes.
19     Q    Is it more than 500?
20     A    I don't know, and, really, off the top
21 of my head, I couldn't tell you.
```

Page 12

```
1      Q    Do you remember when PHICO became
2  insolvent?
3      A    The exact date, I don't.  I couldn't
4  tell you off the top of my head the exact date.
5      Q    Do you remember the year?
6      A    It's been in the last couple of years.
7  I can't tell you a year off the top of my head.
8      Q    Has the Guaranty Corporation made an
9  assessment to its members because of the PHICO
10 insolvency?
11     A    We've made assessments in the last few
12 years for the Workers Comp account.
13     Q    Go ahead.
14     A    The Workers Comp account has been the
15 last assessments that we've made over the last
16 few years.
17     Q    There's a Workers Comp account, a
18 surety account, and another account?
19     A    Workers Comp.  There's title, auto,
20 Workers Comp, and all other.
21     Q    Has there been an assessment in the all
```

3 (Pages 9 to 12)

# Deborah Price

Page 13

1  other account in the last five years?
2      A    I don't remember the exact date of the
3  last assessment that was not Workers Comp.
4      Q    Did PHICO write Workers Compensation
5  insurance?
6      A    I would have to look that up.  I don't
7  know.
8      Q    Do you know if a majority of the PHICO
9  claims that the Guaranty Corporation is handling
10  are related to nursing home or medical
11  malpractice issues?
12      A    No, I do not know.
13      Q    You are aware of that in addition to
14  the Manor Care policy, PHICO wrote medical
15  malpractice insurance?
16      A    I, I don't know.
17      Q    Has the Guaranty Corporation paid any
18  PHICO claims?
19      A    Yes.
20      Q    And can you tell me the amount of
21  claims that have been paid by the Guaranty

Page 14

1  Corporation as a result of the PHICO insolvency?
2      A    No.
3      Q    Has it been more than a million
4  dollars?
5      A    I don't know.
6      Q    Who would know that?
7      A    If I had reference material, I could
8  tell you that, you know, from reference materials
9  at the office.  I just don't know it off the top
10  of my head.
11      Q    Are you aware that the Guaranty
12  Corporation has paid at least two claims where
13  Manor Care, my client, was the named insured on a
14  policy?
15      A    I do not know.
16      Q    Well, who would know that?
17      A    Claims adjustor.
18      Q    Would that information be contained in
19  any annual report that is prepared by the
20  Guaranty Corporation?
21      A    Which information?

Page 15

1      Q    The number of PHICO claims, the amount
2  paid on the PHICO claims, the insureds on the
3  PHICO policies?
4      A    In an annual statement?
5      Q    In an annual, quarterly, monthly, any
6  kind of report?
7      A    You want to know if the number of
8  claims, the amount of claims, and the insured
9  name is included in an annual report?
10      Q    Any of that information, annual,
11  monthly, or quarterly?
12          MR. MEZZANOTTE:  The question is pretty
13  vague.  I'm going to object to it.
14  BY MR. KOWALSKI:
15      Q    Go ahead.
16      A    All of the information?  Are you asking
17  if all of the information is contained in the
18  same report or different reports?
19      Q    Are there different reports for any of
20  those categories that I mentioned?
21      A    Yes.

Page 16

1      Q    And are those reports prepared on a
2  monthly, quarterly, or some other basis?
3      A    Quarterly.
4      Q    Assuming that the Guaranty Corporation
5  pays a PHICO claim on a medical malpractice
6  policy, from what account are those funds taken
7  from or credited to?
8          MR. MEZZANOTTE:  Object to the form.
9  BY MR. KOWALSKI:
10      Q    Go ahead.
11      A    Medical malpractice claims.
12      Q    Right.
13      A    All other.
14      Q    Where does the Guaranty Corporation get
15  the money to fund the all other account that
16  that's used to pay medical malpractice claims?
17      A    Assessment.
18      Q    Are assessments made on an annual basis
19  by the Guaranty Corporation?
20      A    On an as-needed basis.
21      Q    Does the Guaranty Corporation's year

4 (Pages 13 to 16)

## Deborah Price

Page 17

1  coincide with the calendar year or is it
2  different?
3      A    Calendar year.
4      Q    And there has not been an assessment
5  for 2002 or 2003 as a result of the other funds?
6      A    No.
7      Q    Will there be one in 2004?
8      A    I couldn't tell.  I don't know.
9      Q    Do you know if any other funds have
10  been used to pay any PHICO claims from the date
11  of their insolvency until today?
12      A    Any other funds?
13          MR. MEZZANOTTE:  Objection.  It
14  depends -- go ahead.  Sorry.
15          (The Reporter read the previous
16  question.)
17  BY MR. KOWALSKI:
18      Q    Let me try that question again.  Do you
19  know if any money from the other funds account
20  has been used to pay any PHICO claims from the
21  date of their insolvency until today?

Page 18

1          MR. MEZZANOTTE:  Objection.  Your
2  question, I don't understand it, and I don't know
3  if she does, but unless I do, I'm not going to
4  let her answer it.  What other funds are you
5  talking about?  Are you talking about the all
6  other account?
7          MR. KOWALSKI:  Right.  If I use the
8  word, other funds, will you --
9          MR. MEZZANOTTE:  No.  Use the proper
10  term.  Don't --
11          MR. KOWALSKI:  Al --
12          MR. MEZZANOTTE:  No, it's not
13  negotiable.  It's called all other.  Just use the
14  correct term.
15          MR. KOWALSKI:  Will you read the
16  question back.
17          (The Reporter read the previous
18  question.)
19  BY MR. KOWALSKI:
20      Q    Give me the name that you use to
21  describe the other funds.  Is it all other funds?

Page 19

1      A    All other.
2      Q    The all other funds account?
3      A    All other --
4          MR. MEZZANOTTE:  All other.
5          THE WITNESS:  -- account.
6  BY MR. KOWALSKI:
7      Q    Do you know if any money has been used
8  from the all other account to pay any PHICO funds
9  from the date of the, PHICO claims from the date
10  of PHICO's insolvency until today?
11          MR. MEZZANOTTE:  Objection.  You can
12  answer.
13          THE WITNESS:  Off the top of my head, I
14  couldn't tell you.
15  BY MR. KOWALSKI:
16      Q    Who would know that at the Guaranty
17  Corporation?
18      A    I could tell you that if I had
19  reference material, and if I was at the office, I
20  could look it up.
21      Q    You don't know whether any money from

Page 20

1  the all other account has been used for any PHICO
2  claim?
3          MR. MEZZANOTTE:  Objection.  She's
4  already answered the question.  You don't have to
5  answer again.
6  BY MR. KOWALSKI:
7      Q    Your answer is, you don't know?
8          MR. MEZZANOTTE:  Her answer was what
9  she stated before.  Come on.
10  BY MR. KOWALSKI:
11      Q    Do you provide a monthly summary of the
12  funds in the all other account?
13      A    Generally, we do that on a quarterly
14  basis, also.
15      Q    Do you know if there is any money in
16  the all other account?
17      A    Yes.
18      Q    Where did that money come from?
19      A    Assessments.
20      Q    When was the last assessment that
21  produced funds for the all other account?

**Esquire Deposition Services**

D.C. - 1-800-441-3376
MD - 1-800-539-6398

## Deborah Price

Page 21

1    A    Off the top of my head, I couldn't tell
2  you.
3         MR. MEZZANOTTE:  We can go off the
4  record for a minute.
5         (Discussion off the record.)
6         MR. MEZZANOTTE:  I don't want to leave
7  that answer standing because the answer is not
8  accurate and this was not a designee deposition.
9         The areas of inquiry were not known to
10  us.  If they had been, we might have other
11  witnesses to answer different areas of inquiry,
12  but there are other sources like claims
13  recoveries from the receiver that fund all of
14  these accounts.
15  BY MR. KOWALSKI:
16    Q    Can you tell me all sources of money
17  that fund the all other account?
18    A    Assessment.  Early access.  (Pause.)
19  That's the most that I am aware of.
20    Q    What is early access?
21    A    Money received from a liquidator.

Page 22

1    Q    Has the Guaranty Corporation received
2  any money from the PHICO liquidator?
3    A    (Pause.)  I don't remember off the top
4  of my head if we received any from them.
5    Q    By an assessment, you mean an
6  assessment made to an insurance company
7  authorized to do business in the state of
8  Maryland?
9    A    I'm sorry.  Can you repeat that.
10    Q    By an assessment, you mean an
11  assessment or a charge to an insurance company
12  that is authorized to do business in the state of
13  Maryland?
14    A    Yes.
15    Q    Do you know if the Guaranty
16  Corporation is a member of the National
17  Conference of Insurance Guaranty Funds?
18    A    Yes.
19    Q    Have you ever attended a meeting of the
20  National Conference of Insurance Guaranty Funds?
21    A    Yes.

Page 23

1    Q    When was the last time you attended a
2  meeting of the National Conference of Insurance
3  Guaranty Funds?
4    A    May 2003.
5    Q    And have you attended meetings other
6  than the May 2003 meeting?
7    A    Yes.
8    Q    Do you regularly attend the meetings of
9  the NCIGF?
10         MR. MEZZANOTTE:  Objection.  Can you
11  define what you mean by the meetings of the
12  NCIGF?
13  BY MR. KOWALSKI:
14    Q    Do you know what I mean by the meetings
15  of the NCIGF?
16    A    My assumption was the annual meetings.
17    Q    How many annual meetings of the NCIGF
18  have you attended?
19    A    Most of them.
20    Q    Did anyone else from the Guaranty
21  Corporation attend the May 2003 meeting of the

Page 24

1  NCIGF?
2    A    Yes.
3    Q    Who else attended?
4    A    Joseph Petr and Doug Knight.
5    Q    Where was that meeting?
6    A    New Orleans.
7    Q    Does the Guaranty Corporation prepare
8  an annual plan of operation?
9    A    The corporation has a plan of
10  operation.
11    Q    Is it prepared or updated on an annual
12  basis?
13    A    I don't know.
14    Q    Do you have any involvement in the
15  preparation of the plan of operation of the
16  Guaranty Corporation?
17    A    No.
18    Q    Who does?
19         MR. MEZZANOTTE:  If you know.
20         THE WITNESS:  I don't know every one
21  that would have, you know, something to do with

6 (Pages 21 to 24)

## Deborah Price

Page 25

1  any changes or updates.
2  BY MR. KOWALSKI:
3    Q    Give me the names of some of the people
4  that might or that are involved in updating the
5  plan of operation.
6    A    (Pause.)  Joseph Petr.  That would be
7  all that I would know.
8    Q    What other insolvencies is the Guaranty
9  Corporation dealing with now other than PHICO?
10   A    Do you want me to name all of the other
11  insolvencies?
12   Q    As many as you can, please.
13        MR. MEZZANOTTE:  Objection.  Go ahead.
14        THE WITNESS:  PHICO, Transit Casualty,
15  American Mutual Liability, American Mutual of
16  Boston, Reliance, American Druggist, Midland,
17  Ideal Mutual, Mission, Mission National,
18  Enterprise, Westmoreland, Rockwood, Integrity.
19        MR. MEZZANOTTE:  Is there a point to
20  this, by the way?  Sir, is there a point to this?
21        MR. KOWALSKI:  Do you have an

Page 26

1  objection?  I want to hear --
2            (Simultaneous speaking.)
3        MR. MEZZANOTTE:  Yeah, I do.  What,
4  what, what does it have to do with anything?
5  What does any of this have to do with anything to
6  do with this case?
7        It's a simple case.  You claim your
8  client was a resident of the state of Maryland.
9  We say they're not.
10       You're asking her about meetings and
11  all kinds of goofy things that are just wasting
12  everybody's time.  Get to a point, for God's
13  sake.
14       Now you want to know every insolvency
15  that they're handling?  There are hundreds of
16  them, so what is the point, and until you tell
17  me, we're done.  Okay?
18  BY MR. KOWALSKI:
19   Q    Do you remember any other insolvencies
20  that --
21            (Simultaneous speaking.)

Page 27

1        MR. MEZZANOTTE:  Hey.  She's not
2  answering a question until you tell me what the
3  point is.  This isn't a guessing game or a memory
4  contest.
5        You know what her area of
6  responsibility is and you're asking her all kinds
7  of things that have not a blessed thing to do
8  with this case.  You're wasting my time and, more
9  importantly, her time.
10       MR. KOWALSKI:  Are you instructing her
11  not to answer?
12       MR. MEZZANOTTE:  I'm telling you, she's
13  not answering anything till you tell me what it
14  has to do with the case so we can move forward.
15       MR. KOWALSKI:  Would you mark that as
16  Exhibit 1, please.
17       MR. MEZZANOTTE:  Counsel, ignoring me
18  is not going to move the ball, so you tell me
19  what it has to do with anything and I'll be happy
20  to cooperate in any way I can.
21       But thus far, it is so mysterious, and

Page 28

1  I've been doing this for 20 some years.  I
2  confess, I can learn something new, but this is
3  really out in left field.
4        Well, I guess we're through if you're
5  going to sit there, giving me stony silence and
6  staring me at like I'm supposed to be scared or
7  something.  You don't intimidate me, sir, so do
8  you want to discuss this further or are we
9  through?
10       MR. KOWALSKI:  I have more questions to
11  ask this Witness.
12       MR. MEZZANOTTE:  Well, then, let's move
13  on from this area.
14       MR. KOWALSKI:  I asked the court
15  reporter to mark an exhibit.
16            (Discussion off the record.)
17            (Price Exhibit Nos. 1, 2, and
18            3 were marked for identification and
19            were attached to the transcript.)
20  BY MR. KOWALSKI:
21   Q    Is it Ms. or Mrs. Price?

7 (Pages 25 to 28)

**Deborah Price**

Page 29

1     A     Ms.
2     Q     Ms. Price, let me hand you what has
3  been marked as Price Exhibit 1, and will you
4  confirm that you've seen that document and, in
5  fact, signed the document?
6     A     (Indicating.)  Yes.
7     Q     And have you reviewed the answers that
8  you provided before the deposition here today?
9     A     Yes.
10    Q     Do you wish to make any changes to the
11 answers that you've provided?
12          MR. MEZZANOTTE:  Objection.  Read every
13 single word before you answer that question.
14 BY MR. KOWALSKI:
15    Q     Do you wish to make any changes to the
16 answers that you've provided?
17          MR. MEZZANOTTE:  Objection.  Read every
18 single word before you answer that question.
19          THE WITNESS:  (Indicating.)
20 BY MR. KOWALSKI:
21    Q     Have you finished reading Exhibit 1?

Page 30

1     A     Yes.
2     Q     Do you believe your answers to be true,
3  thorough, and accurate?
4     A     Yes.
5     Q     Do you wish to make any changes to any
6  of those answers?
7     A     No.
8     Q     A few minutes ago, you told me that
9  that source of revenues at the Guaranty
10 Corporation was derived from assessments and
11 early access funds.  Correct?
12    A     Yes.
13    Q     Your answer to Interrogatory No. 2
14 doesn't discuss early access funds.
15    A     (Indicating.)  Early access that's
16 received from the liquidator is reimbursement
17 that PCI, money that PCIGC has already paid for
18 claims and claims expenses.
19    Q     Before they were reimbursed by the
20 liquidator, where did PCIGC get those funds?
21    A     From assessment.

Page 31

1     Q     So if early access funds are received,
2  the assessment account is credited with those
3  funds?
4     A     Yes.
5     Q     Could you go back to Interrogatory
6  No. 1.
7     A     (Indicating.)
8     Q     Before answering Interrogatory No. 1,
9  did you read the complaint that Manor Care filed
10 or the answer that was filed on behalf of the
11 Guaranty Corporation?
12    A     No.
13    Q     Let me hand you Exhibit 3.  Exhibit 3
14 is a set of documents that were provided to me by
15 your counsel along with Exhibit 2 which is the
16 response of the Guaranty Corporation to the
17 Plaintiff's Request for Production of Documents.
18    A     (Indicating.)
19    Q     Did you gather the documents that are
20 part of composite Exhibit 3?
21    A     These documents, yes.  (Indicating.)

Page 32

1     Q     The first page of the Exhibit 3 is a
2  notice from the Guaranty Corporation concerning
3  an assessment that was made in 1993.  Correct?
4     A     Yes.
5     Q     At the top, it says Billing For and
6  then a number of insurance companies are listed?
7     A     Yes.
8     Q     Were the companies listed in the
9  Billing For category all of the insolvent
10 insurance companies that the Guaranty Corporation
11 was responsible for during 1993?
12          MR. MEZZANOTTE:  Objection.
13          THE WITNESS:  The companies listed here
14 on the bill are those that the Guaranty
15 Corporation was handling and paying Workers Comp
16 claims.
17 BY MR. KOWALSKI:
18    Q     In 1993?
19    A     Yes.
20    Q     I take it by the documents and your
21 answers that the Guaranty Corporation was not

8 (Pages 29 to 32)

# Deborah Price

Page 33

1  paying any claims from the all other account in
2  1993?
3       MR. MEZZANOTTE:  Objection.  That's not
4  what she said.
5  BY MR. KOWALSKI:
6       Q    Is that true?
7       MR. MEZZANOTTE:  What is what true,
8  that she didn't say that?  What, what are you
9  asking?
10 BY MR. KOWALSKI:
11      Q    Did the Guaranty Corporation pay any
12 claims from the all other account in 1993?
13      A    I couldn't tell you that off the top of
14 my head.
15      Q    Do you know if the Guaranty Corporation
16 paid any claims from the all other account from
17 1993 till the present?
18      A    From 1993 till the present from the all
19 other account?
20      Q    Yes.
21      A    Yes, we paid claims.

Page 34

1       Q    And do you know in what years you paid
2  claims?
3       A    I couldn't tell you off the top of my
4  head.
5       Q    Was an assessment then made for the
6  claims paid out of the all other account?
7       A    When?
8       Q    From 1993 to the present.
9       MR. MEZZANOTTE:  Object to the present.
10 Okay?  It's not relevant.  You asked about the
11 period 1993 to 1997.  Your client wasn't insured
12 by PHICO after '97, so whatever happened after
13 '97 is totally irrelevant.
14      If the question is, what assessments
15 were made from 1993 to 1997 at all, we've given
16 you all the assessment documents for that period
17 of time.
18      MR. KOWALSKI:  Well, the question was
19 to the present, considering that claims have been
20 paid --
21               (Simultaneous speaking.)

Page 35

1       MR. MEZZANOTTE:  Well, I'm instructing
2  her not to answer.
3       MR. KOWALSKI:  Let me finish, please.
4  Claims were paid from the other account as a
5  result of the PHICO insolvency.
6       MR. MEZZANOTTE:  Well, your argument is
7  that your client was a Maryland resident prior to
8  1998 and you know our position on the matter.
9       Whatever happened from that time
10 forward, your client wasn't paying any money to
11 PHICO.  I don't know who they may have been
12 paying, but that's not at issue in this case.
13      So whatever happened with the guaranty
14 fund, whoever and wherever they paid claims from
15 1997 to the present has not a blessed thing to do
16 with this and it relates to financial information
17 to which you're not entitled, sir.
18      This is confidential information and
19 you can't just probe because you happen to think
20 you might stumble upon some fact that maybe might
21 in some possible way help you, so you tell me why

Page 36

1  you need that information and I'll consider it.
2       Or if you want to play the same game
3  that you did before and sit there and stare at
4  me, then go ahead, but she's not going to answer
5  the question.
6  BY MR. KOWALSKI:
7       Q    Has the Guaranty Corporation paid any
8  claims from the all other account between 1993
9  through 1997?
10      A    Off the top of my head, I don't know.
11      Q    And who at the Guaranty Corporation
12 would know that?
13      A    I could tell you that if I was at the
14 office and could look it up.
15      Q    Could you go to the fourth page of
16 Exhibit 3, please.
17      A    (Indicating.)
18      Q    That's a notice or letter dated
19 August 15th of 1994?
20      A    Yes.
21      Q    And, again, toward the top of that

Esquire Deposition Services

D.C. - 1-800-441-3376
MD - 1-800-539-6398

## Deborah Price

Page 37

1  document, there are a number of insurance
2  companies listed after the Billing For category?
3      A   Yes.
4      Q   Am I correct in assuming that those are
5  all of the insurance companies that wrote Workers
6  Compensation insurance for which the Guaranty
7  Corporation was handling claims in 1994?
8      A   Those are the companies that PCIGC was
9  paying Workers Comp claims at that time.
10     Q   What do you know about the Bandera
11 versus Manor Care claim that was presented to the
12 Guaranty Corporation?
13         MR. MEZZANOTTE:  Objection.
14         THE WITNESS:  I don't know anything
15 about that.
16 BY MR. KOWALSKI:
17     Q   Who at the Guaranty Corporation would
18 have knowledge about the Bandera claim?
19         MR. MEZZANOTTE:  Objection.  She just
20 said she doesn't know anything about it.  Come
21 on.

Page 38

1          MR. KOWALSKI:  I'm asking her who at
2  the Guaranty Corporation has knowledge of the
3  Bandera claim?
4          MR. MEZZANOTTE:  Well, if she doesn't
5  know anything about the Bandera claim, how would
6  she know who knows about the Bandera claim?  Come
7  on, counsel.  That's ridiculous.
8          MR. KOWALSKI:  Interrogatory No. 1 asks
9  your client to identify all persons who are
10 likely to have personal knowledge of any fact
11 alleged in the complaint.
12         MR. MEZZANOTTE:  Yeah.  We responded --
13             (Simultaneous speaking.)
14         MR. KOWALSKI:  Let me finish, please.
15             (Simultaneous speaking.)
16         MR. MEZZANOTTE:  -- in accordance with
17 what you --
18         MR. KOWALSKI:  Let me finish.
19         MR. MEZZANOTTE:  -- what you submitted
20 to us as the areas that you were interested in
21 inquiring about, so if you want to debate about

Page 39

1  that, do it with me, not with her.
2          MR. KOWALSKI:  Interrogatory No. 1
3  asked your client to identify all persons who are
4  likely to have personal knowledge of any fact
5  alleged in the complaint.  The only person that
6  your client identified was Deborah Price.
7          MR. MEZZANOTTE:  All right.  Well, the
8  appropriate response to that interrogatory --
9              (Simultaneous speaking.)
10         MR. KOWALSKI:  Are you going to amend
11 your interrogatory answers?
12         MR. MEZZANOTTE:  Wait a minute.  Okay?
13 You asked me a question.  Now, unlike you, I'll
14 answer your question.
15         This case was about what you asked us
16 to provide because the appropriate response to
17 that interrogatory is, it's vague, it's
18 irrelevant, and it can't be answered because it
19 requires someone to read your materials and guess
20 and speculate as to what you may mean.  But
21 rather than answer that way -- are you shushing

Page 40

1  me?
2          THE COURT REPORTER:  Sir, I am not
3  going to be subjected to your screaming.  I'm
4  really sorry.
5          MR. MEZZANOTTE:  Well, that's not your
6  choice, ma'am.
7          THE COURT REPORTER:  Yes, it is.
8          MR. MEZZANOTTE:  I'm sorry.  Your job
9  is to take down --
10         THE COURT REPORTER:  It is my choice.
11         MR. MEZZANOTTE:  -- what I say.
12         THE COURT REPORTER:  Not in this
13 climate.  I will take this (indicating)
14 somewhere.  I've got this right on tape.  I am
15 not going to be subjected to your screaming.
16         MR. MEZZANOTTE:  I'm not screaming --
17         THE COURT REPORTER:  Thank you.
18         MR. MEZZANOTTE:  -- and the tape,
19 rather, will reflect that.  Can you read back
20 what I said, please, because I've lost my train
21 of thought.

10 (Pages 37 to 40)

# Deborah Price

Page 41

1          (The Reporter read the record.)
2          MR. MEZZANOTTE:  Rather than answer
3    that way, we tried to be cooperative and respond
4    to the areas that you indicated to us you were
5    interested in finding out, which was about the
6    assessments.
7          Now, counsel, very simply, this case is
8    not about all these things that you're raising.
9    You know what it's about.
10         You claim your client is entitled to
11   the benefits of the Maryland Guaranty Fund
12   Statute because, at one time, your client was a
13   resident of the state of Maryland.
14         Our contention is that the
15   interpretation of the statute as it's written is
16   that your client is not entitled to those
17   benefits because your client is, in fact, and
18   you've admitted, an Ohio resident.
19         So all of these things, I don't know
20   about the Bandera claim, and if you're going to
21   go through every claim and ask her the same

Page 42

1    questions, there are claims people and they can
2    be identified.
3          But what that has to do with this case
4    totally, totally escapes me, so whether you're
5    here to harass and annoy, oppress, embarrass,
6    humiliate, I don't know, but it's not appropriate
7    and I'm not going to stand for it and I'm not
8    going to subject the Witness to it.
9          And if I have raised my voice
10   inappropriately, I apologize to everyone in the
11   room, but I'm frustrated because you know what
12   the court reporter may not know which is, none of
13   this has anything to do with our case.
14         And so I feel you are subjecting this
15   Witness inappropriately to this kind of display
16   and you're trying to embarrass her and intimidate
17   her and that's totally improper.  We don't do
18   that.
19         And if you want to argue with me,
20   that's fine, but we don't need to spend time
21   taking this Witness's time to go through things

Page 43

1    that have nothing to do with what you asked us
2    about and that's what we tried to provide you in
3    the answers to interrogatories rather than raise
4    objections and rather than go through prolonged
5    battles about it.
6          So now, because we were cooperative and
7    provided you what you want, you're trying to pull
8    this stunt where you act like we haven't fully
9    answered the question.  It couldn't be further
10   from the truth.
11         MR. KOWALSKI:  Again, I'll state,
12   Interrogatory No. 1 asked your client to identify
13   all persons who are likely to have personal
14   knowledge of any fact alleged in the complaint.
15         The Bandera lawsuit was specifically
16   alleged in the complaint.  The only person you
17   identified in response to Interrogatory No. 1 was
18   the Witness that you have produced today.
19         MR. MEZZANOTTE:  Ms. Price has general
20   knowledge --
21         MR. KOWALSKI:  Let me finish.

Page 44

1
2          MR. MEZZANOTTE:  -- as to the process
3    of establishing the assessments due from each
4    member insured.
5          MR. KOWALSKI:  I assumed that since her
6    name was given in response to Interrogatory
7    No. 1, I would travel here today from Toledo and
8    be able to question her about the items that your
9    client indicated she had knowledge of.
10         MR. MEZZANOTTE:  Well, in the designee
11   notice that you filed previous to all of this,
12   none of those areas of inquiry were identified.
13         Only the assessment area and the answer
14   to Interrogatory No. 1 says quite clearly that
15   she has knowledge about the assessments.
16         It doesn't say anything about anything
17   else.  You never objected.  You never asked us to
18   provide information as to anyone else or any
19   other areas that you were interested in.
20         You had these for months now and this
21   is the first I'm hearing that you have a problem,

11 (Pages 41 to 44)

# Deborah Price

Page 45

1  so we'll have to resolve the problem elsewhere.
2  Let's go off the record.
3          (Discussion off the record.)
4  BY MR. KOWALSKI:
5      Q    What is the process for determining
6  whether an assessment is necessary?
7      A    We look at the current reserves, we
8  look at the past maybe year's history of
9  payments, and we estimate what we may pay out,
10 say, for the next, you know, for the coming year,
11 and we look at the balance that we have in that
12 account and then determine if an assessment is
13 necessary.
14     Q    Does this analysis occur for each of
15 the four accounts?
16     A    Yes.
17     Q    Do you know anything about the 1986
18 amendment to the Guaranty Corporation statute?
19     A    No.
20     Q    Were you at the Guaranty Corporation
21 in '86?

Page 46

1      A    Yes.
2      Q    You just started then?
3      A    Yes.
4      Q    Who was the executive director or the
5  head executive in 1986 when you started?
6      A    Joseph Petr.
7      Q    And do you know when Mr. Petr started?
8      A    No.
9      Q    Would you agree that Manor Care is a
10 policyholder of PHICO for the years 1993 through
11 1997?
12         MR. MEZZANOTTE:  Objection.
13         THE WITNESS:  I don't know.
14 BY MR. KOWALSKI:
15     Q    Have you ever reviewed the PHICO
16 insurance policies that were issued to Manor
17 Care?
18     A    No.
19     Q    Who at the Guaranty Corporation would
20 be responsible for reviewing those policies when
21 an insolvency occurs?

Page 47

1      A    I don't know whose responsibility it
2  is.
3      Q    Do you think the last time an
4  assessment was made because of the motor vehicle
5  insurance account?
6          MR. MEZZANOTTE:  Objection, and I'll
7  instruct her not to answer.  It's not relevant to
8  anything.  There's no motor vehicle insurance
9  involved in this case.
10 BY MR. KOWALSKI:
11     Q    Do you know if PHICO issued any motor
12 vehicle insurance policies?
13         MR. MEZZANOTTE:  Objection.
14         THE WITNESS:  I don't know.
15 BY MR. KOWALSKI:
16     Q    Do you know the last time an assessment
17 was made as a result of the title insurance?
18         MR. MEZZANOTTE:  Objection.  The same
19 grounds, and I instruct her not to answer that.
20 BY MR. KOWALSKI:
21     Q    Do you know the last time the Guaranty

Page 48

1  Corporation provided a refund to any member
2  insurance company --
3          MR. MEZZANOTTE:  Objection.
4  BY MR. KOWALSKI:
5      Q    -- from any of the accounts?
6          MR. MEZZANOTTE:  Objection.  That's
7  confidential financial information.  It's got
8  nothing to do with this case.
9          MR. KOWALSKI:  Are you instructing her
10 not to answer?
11         MR. MEZZANOTTE:  I'm instructing her
12 not to answer.
13 BY MR. KOWALSKI:
14     Q    Do you know how long PHICO was a member
15 of the Guaranty Corporation?
16     A    No.
17     Q    Do you know if they were a member
18 before 1993?
19     A    I, I don't know.
20     Q    Who would know that?
21     A    I have some reference material at the

12 (Pages 45 to 48)

## Deborah Price

Page 49

1  office that I could look up, but I don't know if
2  it would show that.
3          MR. MEZZANOTTE:  It's probably on
4  record at the Insurance Department, I would
5  think.
6  BY MR. KOWALSKI:
7      Q    You have Exhibit 3 in front of you?
8      A    Yes.
9      Q    And you have the first page which we
10 talked about earlier as the assessment notice
11 from 1993?
12     A    Yes.
13     Q    Following that page is a memo to all
14 the members of the Guaranty Corporation which
15 reflects the assessment that is discussed in the
16 previous page?
17     A    Yes.
18     Q    Based on the second page of Exhibit 3,
19 can we conclude that the Guaranty Corporation
20 did not pay any claims from the title insurance
21 account that year?

Page 50

1          MR. MEZZANOTTE:  Objection.
2  BY MR. KOWALSKI:
3      Q    Go ahead.
4      A    I'm sorry.  The question was, the
5  corporation did not pay any claims from the title
6  account?
7      Q    Yes, that year.
8      A    Yes.  We did not.
9      Q    Same answer for the motor vehicle
10 account?
11     A    I don't --
12     Q    Go ahead.
13     A    I would have to look that up.
14     Q    Well, if you would have paid claims
15 that year, would you necessarily have had an
16 assessment that year?
17     A    No.
18     Q    And the reason you may not have had an
19 assessment is there would have been carry-over
20 funds from the previous year in that account?
21     A    There would be a balance in that

Page 51

1  account.
2      Q    If an assessment is made to a
3  particular account -- let me start over.  An
4  assessment is made using the Guaranty
5  Corporation's best estimate as to how much it's
6  going to cost to settle those claims out of that
7  account for the coming year in a general sense?
8      A    I'm sorry.  Can you repeat that.
9  Generally?
10     Q    Yes, in a general sense.
11     A    Repeat, please.
12     Q    The assessment is determined by trying
13 to estimate the amount of money needed to pay
14 claims from a particular account in a particular
15 year.
16     A    Yes.
17     Q    Correct?
18     A    Claims and expenses, yes.
19     Q    Claims and expenses.  And if, in fact,
20 the estimate was high, the Guaranty Corporation
21 will carry those funds over to the previous year

Page 52

1  or refund them to the members?
2      A    Either.
3      Q    Does the Guaranty Corporation usually
4  carry those funds over rather than refund them?
5      A    Generally, yes, but we don't have a
6  large balance.
7      Q    You do your best trying to estimate the
8  funds needed in each account?
9      A    Yes.
10     Q    As far as the all other account that is
11 listed on the second page of Exhibit 3, do you
12 know if any claims were paid out of the all other
13 account for that year which is reflected in the
14 August 3 notice there?
15         MR. MEZZANOTTE:  Objection.  It's been
16 asked and answered.  Go ahead.
17         MR. KOWALSKI:  I think we asked about
18 the title, but I don't think we talked about
19 the --
20         MR. MEZZANOTTE:  You asked earlier
21 about it when we were last going through this

13 (Pages 49 to 52)

D.C. - 1-800-441-3376
MD - 1-800-539-6398

# Deborah Price

**Page 53**

1    exhibit.
2              THE WITNESS:  Off the top of my head, I
3    couldn't tell you.
4    BY MR. KOWALSKI:
5         Q    If claims were paid out of the all
6    other account and no assessment was made, we know
7    then there was a surplus from the previous year
8    that carried over to cover those claims?
9         A    Yes.
10        Q    Have you ever attended any members of
11   the Guaranty Corporation board?
12        A    Excuse me?
13        Q    Have you ever attended meetings of the
14   Guaranty Corporation board?
15        A    Board of --
16        Q    Board of directors.
17        A    The board of directors?
18        Q    Yes, ma'am.
19        A    Yes.
20        Q    And do you regularly attend those?
21        A    Not regularly.

**Page 54**

1         Q    Have you attended any meetings of the
2    board of directors of the Guaranty Corporation
3    since the PHICO insolvency?
4         A    Yes.
5         Q    At the meetings that you attended when
6    the PHICO insolvency was discussed, was there any
7    discussion at those meetings concerning the
8    Manor Care claims?
9              MR. MEZZANOTTE:  Objection, and I'm
10   going to instruct her not to answer.  Board
11   meetings are confidential.  They are absolutely
12   privileged.
13   BY MR. KOWALSKI:
14        Q    Do you ever see minutes of the board
15   meetings?
16        A    No.  I don't read the minutes.
17        Q    Have you seen them and do you know they
18   exist?
19        A    I know they exist.
20        Q    Could you go to the seventh page of
21   Exhibit 3, please.

**Page 55**

1         A    (Indicating.)
2         Q    You have a memo to the file from you
3    dated December 16th of 1996?
4         A    Um-hum.  Yes.
5         Q    And did you prepare that memo on or
6    about December 16 of 1996?
7         A    Yes.
8         Q    Do you mean in that memo that there was
9    no assessment made in any of the accounts for
10   1995?
11        A    Yes.
12        Q    The next page is a similar memo that
13   says there was no assessment made for the year
14   1996?
15        A    Correct.
16        Q    Does that memo mean that there was no
17   assessment in any of the four accounts for 1996?
18        A    Yes.
19        Q    The next page concerns 1997.  Same
20   question.  Would your answer be the same, there
21   was no assessment made in any account for 1997?

**Page 56**

1         A    Yes.
2         Q    Again, if the Guaranty Corporation paid
3    claims in 1995, '96, and '97, then payment would
4    have been made from funds that carried over from
5    the balance in those accounts in 1994?
6         A    Yes.
7         Q    Is PHICO the largest insolvency that
8    the Guaranty Corporation is dealing with at the
9    present time in terms of reserve dollars?
10             MR. MEZZANOTTE:  Objection.  If you
11   know.
12             THE WITNESS:  I don't know.
13   BY MR. KOWALSKI:
14        Q    Is it one of the top three or four
15   largest in terms of reserve dollars?
16        A    Currently?
17        Q    Sure.
18        A    I don't know.
19        Q    Was it last year one of the largest
20   companies in terms of reserve dollars?
21             MR. MEZZANOTTE:  Objection.  If you

14 (Pages 53 to 56)

## Deborah Price

Page 57

1  know.
2      THE WITNESS:  I don't know off the top
3  of my head.
4  BY MR. KOWALSKI:
5      Q    Who at the Guaranty Corporation would
6  know the answer to that?
7      A    I could, I could look it up if I had
8  reference.  I have nothing here.  I'm sorry.  I
9  don't remember off the top of my head.
10     Q    Do you know who made the decision to
11  deny the Manor Care claims?
12     A    No.
13         MR. MEZZANOTTE:  Objection.
14  BY MR. KOWALSKI:
15     Q    Do you know if the board made that
16  decision, the board of directors?
17     A    I don't know.
18     Q    Do you know why the Guaranty
19  Corporation has denied the Manor Care claims?
20     A    No.
21     Q    Who at the Guaranty Corporation will

Page 58

1  know why they were denied and what process was
2  involved in the denial?
3      A    I don't know.
4      Q    Do you know if the Guaranty Corporation
5  has denied any claims other than the Manor Care
6  claims on the basis that the policyholder was no
7  longer a resident of the state of Maryland?
8         MR. MEZZANOTTE:  Objection.  Do you
9  know is the question; yes or no?
10         THE WITNESS:  No, I do not know.
11  BY MR. KOWALSKI:
12     Q    And who would know the answer to that
13  question?
14         MR. MEZZANOTTE:  Objection to that
15  question.
16         THE WITNESS:  I don't know.
17  BY MR. KOWALSKI:
18     Q    You don't know?
19     A    No.
20     Q    Would Mr. Petr know the answer to that
21  question?

Page 59

1      A    I don't know.
2         MR. MEZZANOTTE:  Objection.  Calls for
3  her to speculate as to what someone else may
4  know.  It's improper.
5  BY MR. KOWALSKI:
6      Q    Is Reliance primarily an auto insurer?
7         MR. MEZZANOTTE:  Objection.
8         THE WITNESS:  I don't know.
9         MR. KOWALSKI:  We'll adjourn the
10  deposition at this time, subject to the
11  instructions that were given for this Witness not
12  to answer.
13         MR. MEZZANOTTE:  All right.  Which
14  ones?  We can work it out now.  Tell me.
15         MR. KOWALSKI:  Well, we can go from the
16  beginning and go over --
17         MR. MEZZANOTTE:  Well, there are only a
18  few questions that she was instructed not to
19  answer.  One had to do with --
20         MR. KOWALSKI:  I really don't intend to
21  go back through this transcript and go over it --

Page 60

1         MR. MEZZANOTTE:  Well, I'll take you
2  through it real quick because, if we can work it
3  out now, let's do it.
4         MR. KOWALSKI:  No.  We're going to get
5  this to the judge and we're going to let him help
6  us work this out.
7         MR. MEZZANOTTE:  Well, counsel, you're
8  making the decision now that you don't want to
9  work this out.  I asked you before, why are you
10  asking certain questions?  If you could tell me
11  that, then perhaps we can work it out now.  Are
12  you electing not to do that?
13         MR. KOWALSKI:  At this point, I am.
14         MR. MEZZANOTTE:  We will read and sign.
15         (Mr. Mezzanotte responded to inquiry
16  that he wants to order a copy of the transcript.)
17         MR. KOWALSKI:  I do, too, and I want a
18  copy of the tape as well.
19         MR. MEZZANOTTE:  I guess, I'll take
20  one, too.
21

15 (Pages 57 to 60)

# Deborah Price

Page 61

1  (Whereupon, signature not having been waived, the
2  taking of the deposition concluded at 2:50 p.m.)
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21

Page 63

1  ESQUIRE DEPOSITION SERVES
   1020 19TH STREET, NORTHWEST
2  SUITE 620
   WASHINGTON, D.C. 20036
3
4              ERRATA SHEET
5  Case Name:  Manor Care v. Property & Casualty Insurance
                Guaranty Corporation
6  Witness Name:  Deborah Price
   Deposition Date:  Thursday, July 10, 2003
7  Job No.:  153873
8  Page No.  Line No.  Change
9
10
11
12
13
14
15
16
17
18
19  _____     _____
    Signature                    Date
20
21

Page 62

1  Ms. Deborah Price
   c/o Albert J. Mezzanotte, Jr., Esquire
2  Whiteford, Taylor & Preston, L.L.P.
   Seven Saint Paul Street
3  Baltimore, Maryland 21202-1626
4
        IN RE:  Manor Care v. Property & Casualty
5                Insurance Guaranty Corporation
6  As requested at the time of deposition, a copy of your
   deposition transcript is being provided to you through your
7  counsel for your review and signature.  The deponent should
   keep in mind that the purpose of review is only to ensure
8  accuracy and not to revise in an editorial manner.
9  If any changes or corrections are necessary, the deponent
   should prepare an errata sheet listing by page and line
10 numbers the change or correction made; i.e., Page 15,
   Line 8, change "he said" to "she said."
11
   When the errata sheet is completed, it should be signed by
12 the deponent.  This signed errata sheet and original
   signature page of the transcript should be sent to the
13 attorney who ordered the original deposition within thirty
   (30) days, to be attached to the original deposition
14 transcript.
15
16
17
18
19
20
21

Page 64

1  CERTIFICATE OF SHORTHAND REPORTER - NOTARY PUBLIC
2      I, Brenda Hornstein, Certified
3  Shorthand Reporter, the officer before whom the
4  foregoing proceedings were taken, do hereby
5  certify that the witness whose testimony appears
6  in the foregoing deposition was duly sworn by me;
7  that the testimony of said witness was taken by
8  me in stenotype and thereafter reduced to
9  typewriting under my direction; that said
10 deposition is a true record of the testimony
11 given by said witness; that I am neither counsel
12 for, related to, nor employed by any of the
13 parties to the action in which this deposition
14 was taken; and, further, that I am not a relative
15 or employee of any attorney or counsel employed
16 by the parties hereto, nor financially interested
17 in the outcome of the action.
18
19                   _____
                     NOTARY PUBLIC IN AND FOR
                     THE STATE OF MARYLAND
20 My commission expires
21 April 1, 2005

16 (Pages 61 to 64)

**Deborah Price**

**A**

able 44:8
absolutely 54:11
access 21:18,20
  30:11,14,15 31:1
accommodate 6:16
  6:20
account 10:20 11:1,3
  11:5 12:12,14,17
  12:18,18 13:1 16:6
  16:15 17:19 18:6
  19:2,5,8 20:1,12
  20:16,21 21:17
  31:2 33:1,12,16,19
  34:6 35:4 36:8
  45:12 47:5 49:21
  50:6,10,20 51:1,3
  51:7,14 52:8,10,13
  53:6 55:21
accounting 8:1,19
accounts 10:16,21
  11:4 21:14 45:15
  48:5 55:9,17 56:5
accuracy 62:8
accurate 6:12 21:8
  30:3
act 43:8
action 1:7 64:13,17
Adams 3:5
addition 13:13
address 5:10,11
adjourn 59:9
adjustor 14:17
administrator 7:9
  7:11,12,13,16,20
  8:12
admitted 41:18
ago 7:18 10:7,10
  30:8
agree 46:9
ahead 12:13 15:15
  16:10 17:14 25:13
  36:4 50:3,12 52:16
AI 18:11
alarm 9:6
Albert 3:21 62:1
alleged 38:11 39:5
  43:14,16
amend 39:10
amendment 45:18
America 1:5 3:3
American 25:15,15
  25:16
amezzanotte@wtp...

3:20
amount 13:20 15:1,8
  51:13
analysis 45:14
annoy 42:5
annual 4:16 14:19
  15:4,5,9,10 16:18
  23:16,17 24:8,11
answer 18:4 19:12
  20:5,7,8 21:7,7,11
  27:11 29:13,18
  30:13 31:10 35:2
  36:4 39:14,21 41:2
  44:13 47:7,19
  48:10,12 50:9
  54:10 55:20 57:6
  58:12,20 59:12,19
answered 20:4 39:18
  43:9 52:16
answering 27:2,13
  31:8
answers 4:10 29:7
  29:11,16 30:2,6
  32:21 39:11 43:3
Apartment 5:12
apologize 42:10
APPEARANCES
  3:1
appears 64:5
appropriate 39:8,16
  42:6
approved 4:16
approximately 10:9
April 64:21
area 27:5 28:13
  44:13
areas 21:9,11 38:20
  41:4 44:12,19
argue 42:19
argument 35:6
asked 28:14 34:10
  39:3,13,15 43:1,12
  44:17 52:16,17,20
  60:9
asking 15:16 26:10
  27:6 33:9 38:1
  60:10
asks 38:8
assessment 4:15
  12:9,21 13:3 16:17
  17:4 20:20 21:18
  22:5,6,10,11 30:21
  31:2 32:3 34:5,16
  44:13 45:6,12 47:4
  47:16 49:10,15

50:16,19 51:2,4,12
  53:6 55:9,13,17,21
assessments 12:11
  12:15 16:18 20:19
  30:10 34:14 41:6
  44:3,15
assistant 7:11
assumed 44:5
assuming 16:4 37:4
assumption 23:16
as-needed 16:20
attached 4:18 28:19
  62:13
attend 23:8,21 53:20
attended 22:19 23:1
  23:5,18 24:3 53:10
  53:13 54:1,5
attorney 62:13
  64:15
August 36:19 52:14
authorized 22:7,12
auto 12:19 59:6
Avenue 2:14
aware 13:13 14:11
  21:19

**B**

Bachelor's 9:11
back 6:8 18:16 31:5
  40:19 59:21
balance 45:11 50:21
  52:6 56:5
ball 27:18
Baltimore 1:13 3:18
  5:13 9:13 62:3
Bandera 37:10,18
  38:3,5,6 41:20
  43:15
bank 11:5
Based 49:18
basis 16:2,18,20
  20:14 24:12 58:6
battles 43:5
becoming 8:11
beginning 59:16
behalf 3:3,14 31:10
believe 30:2
benefits 41:11,17
best 51:5 52:7
bill 32:14
Billing 32:5,9 37:2
blessed 27:7 35:15
board 4:17 8:9 53:11
  53:14,15,16,17
  54:2,10,14 57:15

57:16
bodily 9:19
boss 8:4
Boston 25:16
break 6:15
Breeze 9:1
Brenda 1:20 2:19
  64:2
Brightstone 5:12
business 22:7,12

**C**

C 4:1
calendar 17:1,3
call 7:2
called 5:3 18:13
Calls 59:2
Care 1:5 3:3 13:14
  14:13 31:9 37:11
  46:9,17 54:8 57:11
  57:19 58:5 62:4
  63:5
carried 53:8 56:4
carry 51:21 52:4
carry-over 50:19
case 26:6,7 27:8,14
  35:12 39:15 41:7
  42:3,13 47:9 48:8
  63:5
Casualty 1:8 3:14
  4:12 5:15 25:14
  62:4 63:5
categories 15:20
category 32:9 37:2
certain 60:10
CERTIFICATE
  64:1
Certified 2:20 64:2
certify 64:5
change 62:10,10
  63:8
changes 25:1 29:10
  29:15 30:5 62:9
charge 22:11
check 8:2
choice 40:6,10
Civil 1:7
claim 10:4 16:5 20:2
  26:7 37:11,18 38:3
  38:5,6 41:10,20,21
claims 8:16 9:19
  10:6,13 11:8 13:9
  13:18,21 14:12,17
  15:1,2,8,8 16:11
  16:16 17:10,20

19:9 21:12 30:18
  30:18 32:16 33:1
  33:12,16,21 34:2,6
  34:19 35:4,14 36:8
  37:7,9 42:1 49:20
  50:5,14 51:6,14,18
  51:19 52:12 53:5,8
  54:8 56:3 57:11,19
  58:5,6
clear 6:12
clearly 44:14
client 14:13 26:8
  34:11 35:7,10 38:9
  39:3,6 41:10,12,16
  41:17 43:12 44:9
climate 40:13
coincide 17:1
come 20:9,18 37:20
  38:6
coming 8:20 45:10
  51:7
commission 64:20
Comp 12:12,14,17
  12:19,20 13:3
  32:15 37:9
companies 32:6,8,10
  32:13 37:2,5,8
  56:20
company 9:6 22:6
  22:11 48:2
Compensation 13:4
  37:6
complaint 31:9
  38:11 39:5 43:14
  43:16
completed 62:11
composite 31:20
computer 7:21 8:18
concerning 32:2
  54:7
concerns 55:19
conclude 49:19
concluded 61:2
Conference 22:17
  22:20 23:2
confess 28:2
confidential 35:18
  48:7 54:11
confirm 29:4
consider 36:1
considering 34:19
contained 34:18
  15:17
contention 41:14
contest 27:4

# Deborah Price

Page 66

contract 10:12
Cooper 3:4
cooperate 27:20
cooperative 41:3
  43:6
copy 60:16,18 62:6
corporation 1:9 3:15
  4:13 5:16 7:3,4,8
  8:5,13,15,21 10:1
  10:3,8,12,16 11:9
  12:8 13:9,17 14:1
  14:12,20 16:4,14
  16:19 19:17 22:1
  22:16 23:21 24:7,9
  24:16 25:9 30:10
  31:11,16 32:2,10
  32:15,21 33:11,15
  36:7,11 37:7,12,17
  38:2 45:18,20
  46:19 48:1,15
  49:14,19 50:5
  51:20 52:3 53:11
  53:14 54:2 56:2,8
  57:5,19,21 58:4
  62:5 63:5
Corporation's 16:21
  51:5
correct 18:14 30:11
  32:3 37:4 51:17
  55:15
correction 62:10
corrections 62:9
cost 51:6
counsel 5:3,6 27:17
  31:15 38:7 41:7
  60:7 62:7 64:11,15
couple 12:6
court 1:1 6:1,8 28:14
  40:2,7,10,12,17
  42:12
cover 53:8
Credit 9:1
credited 16:7 31:2
Crest 10:5
current 45:7
Currently 56:16
c/o 62:1

**D**

daily 8:2
data 8:16
date 12:3,4 13:2
  17:10,21 19:9,9
  63:6,19
dated 36:18 55:3

days 62:13
dealing 25:9 56:8
debate 38:21
Deborah 1:12 2:9
  4:2 5:2,9,10 39:6
  62:1 63:6
December 55:3,6
decision 57:10,16
  60:8
Defendant 1:10 3:14
  4:11
define 23:11
degree 9:11,16
denial 58:2
denied 57:19 58:1,5
deny 57:11
Department 49:4
depends 17:14
deponent 62:7,9,12
deposition 1:12 2:9
  4:9 5:19 21:8 29:8
  59:10 61:2 62:6,6
  62:13,13 63:1,6
  64:6,10,13
derived 30:10
describe 18:21
designee 21:8 44:10
determine 45:12
determined 51:12
determining 45:5
different 15:18,19
  17:2 21:11
direction 64:9
director 46:4
directors 4:17 53:16
  53:17 54:2 57:16
discuss 28:8 30:14
discussed 49:15 54:6
discussion 21:5
  28:16 45:3 54:7
display 42:15
DISTRICT 1:1,2
DIVISION 1:3
document 29:4,5
  37:1
documents 4:14,18
  31:14,17,19,21
  32:20 34:16
doing 28:1
dollars 14:4 56:9,15
  56:20
Doug 10:5 24:4
Drive 5:12
Druggist 25:16
due 44:3

duly 64:6
D.C 63:2

**E**

E 4:1
earlier 49:10 52:20
early 21:18,20 30:11
  30:14,15 31:1
editorial 62:8
education 9:10
Either 52:2
electing 60:12
Electronic 9:7,7
email 3:20
embarrass 42:5,16
employed 5:14 8:14
  10:1,8 64:12,15
employee 64:15
employees 10:11
employer 7:5
ensure 62:7
Enterprise 25:18
entitled 35:17 41:10
  41:16
entry 8:16
errata 62:9,11,12
  63:4
escapes 42:4
Esquire 3:8,21 62:1
  63:1
establish 10:17,20
establishing 44:3
estimate 45:9 51:5
  51:13,20 52:7
everybody's 26:12
exact 12:3,4 13:2
examination 4:2 5:3
  5:6
examined 5:5
examiners 10:6
Excuse 53:12
executive 8:8 46:4,5
exhibit 4:9 27:16
  28:15,17 29:3,21
  31:13,13,15,20
  32:1 36:16 49:7,18
  52:11 53:1 54:21
**EXHIBITS** 4:7
exist 54:18,19
expenses 30:18
  51:18,19
expires 64:20
extent 9:9

**F**

fact 29:5 35:20
  38:10 39:4 41:17
  43:14 51:19
far 27:21 52:10
feel 42:14
field 9:14,18 28:3
file 55:2
filed 6:5 31:9,10
  44:11
financial 35:16 48:7
financially 64:16
finding 41:5
fine 42:20
finish 35:3 38:14,18
  43:21
finished 29:21
first 8:14 32:1 44:21
  49:9
five 13:1
Following 49:13
follows 5:5
foregoing 64:4,6
form 16:8
formal 9:9
forward 27:14 35:10
four 9:4 10:15 11:4
  45:15 55:17 56:14
fourth 36:15
front 49:7
frustrated 42:11
fully 43:8
fund 16:15 21:13,17
  35:14 41:11
funds 10:21 11:3
  16:6 17:5,9,12,19
  18:4,8,21,21 19:2
  19:8 20:12,21
  22:17,20 23:3
  30:11,14,20 31:1,3
  50:20 51:21 52:4,8
  56:4
further 28:8 43:9
  64:14

**G**

game 27:3 36:2
gather 31:19
general 43:19 51:7
  51:10
Generally 20:13
  51:9 52:5
Gerald 3:8
Give 18:20 25:3
given 34:15 44:6
  59:11 64:11

giving 28:5
go 12:13 15:15 16:10
  17:14 21:3 25:13
  31:5 36:4,15 41:21
  42:21 43:4 45:2
  50:3,12 52:16
  54:20 59:15,16,21
  59:21
God's 26:12
going 6:4 15:13 18:3
  27:18 28:5 36:4
  39:10 40:3,15
  41:20 42:7,8 51:6
  52:21 54:10 60:4,5
goodness 9:3
goofy 26:11
grounds 47:19
guaranty 1:9 3:15
  4:12 5:15 7:3,4,7
  8:4,13,15,21 10:1
  10:3,8,12,16 11:9
  12:8 13:9,17,21
  14:11,20 16:4,14
  16:19,21 19:16
  22:1,15,17,20 23:3
  23:20 24:7,16 25:8
  30:9 31:11,16 32:2
  32:10,14,21 33:11
  33:15 35:13 36:7
  36:11 37:6,12,17
  38:2 41:11 45:18
  45:20 46:19 47:21
  48:15 49:14,19
  51:4,20 52:3 53:11
  53:14 54:2 56:2,8
  57:5,18,21 58:4
  62:5 63:5
guess 28:4 39:19
  60:19
guessing 27:3

**H**

hand 29:2 31:13
handling 10:4,13
  13:9 26:15 32:15
  37:7
happen 35:19
happened 34:12
  35:9,13
happy 27:19
harass 42:5
head 11:12,21 12:4,7
  14:10 19:13 21:1
  22:4 33:14 34:4
  36:10 46:5 53:2

## Deborah Price

57:3,9
hear 26:1
hearing 44:21
held 2:10
help 35:21 60:5
hereto 64:16
Hey 27:1
high 51:20
history 45:8
home 13:10
Hornstein 1:20 2:20
  64:2
humiliate 42:6
hundreds 26:15

**I**

Ideal 25:17
identification 28:18
identified 39:6 42:2
  43:17 44:12
identify 38:9 39:3
  43:12
ignoring 27:17
importantly 27:9
improper 42:17 59:4
inappropriately
  42:10,15
included 4:8 15:9
indicated 41:4 44:9
indicating 29:6,19
  30:15 31:7,18,21
  36:17 40:13 55:1
information 14:18
  14:21 15:10,16,17
  35:16,18 36:1
  44:18 48:7
injury 9:19
inquiring 38:21
inquiry 21:9,11
  44:12 60:15
insolvencies 25:8,11
  26:19
insolvency 11:11
  12:10 14:1 17:11
  17:21 19:10 26:14
  35:5 46:21 54:3,6
  56:7
insolvent 12:2 32:9
instruct 47:7,19
  54:10
instructed 59:18
instructing 27:10
  35:1 48:9,11
instructions 59:11
insurance 1:8 3:15

4:12 5:15 13:5,15
  22:6,11,17,20 23:2
  32:6,10 37:1,5,6
  46:16 47:5,8,12,17
  48:2 49:4,20 62:5
  63:5
insured 14:13 15:8
  34:11 44:4
insureds 15:2
insurer 59:6
Integrity 25:18
intend 59:20
Interdisciplinary
  9:15
interested 38:20
  41:5 44:19 64:16
interpretation 41:15
interrogatories 4:10
  43:3
interrogatory 30:13
  31:5,8 38:8 39:2,8
  39:11,17 43:12,17
  44:6,14
intimidate 28:7
  42:16
Intrax 9:6
Invoice 4:15
involved 25:4 47:9
  58:2
involvement 24:14
irrelevant 34:13
  39:18
issue 35:12
issued 46:16 47:11
issues 13:11
issuing 8:2
items 44:8
I-N-T-R-A-X 9:7
i.e 62:10

**J**

J 3:21 62:1
job 1:21 7:1,7,17
  8:12 11:2 40:8
  63:7
Joseph 8:6 24:4 25:6
  46:6
Jr 3:21 62:1
judge 60:5
July 1:14 2:6 63:6
June 4:17

**K**

keep 6:11 62:7
kind 15:6 42:15

kinds 26:11 27:6
Knight 10:5 24:4
know 6:7,16,20 7:5
  10:14 11:20 13:7,8
  13:12,16 14:5,6,8
  14:9,15,16 15:7
  17:8,9,19 18:2
  19:7,16,21 20:7,15
  22:15 23:14 24:13
  24:19,20,21 25:7
  26:14 27:5 33:15
  34:1 35:8,11 36:10
  36:12 37:10,14,20
  38:5,6 41:9,19
  42:6,11,12 45:10
  45:17 46:7,13 47:1
  47:11,14,16,21
  48:14,17,19,20
  49:1 52:12 53:6
  54:17,19 56:11,12
  56:18 57:1,2,6,10
  57:15,17,18 58:1,3
  58:4,9,10,12,16,18
  58:20 59:1,4,8
knowledge 10:15
  37:18 38:2,10 39:4
  43:14,20 44:9,15
known 21:9
knows 38:6
Kowalski 3:8 4:3 5:7
  15:14 16:9 17:17
  18:7,11,15,19 19:6
  19:15 20:6,10
  21:15 23:13 25:2
  25:21 26:18 27:10
  27:15 28:10,14,20
  29:14,20 32:17
  33:5,10 34:18 35:3
  36:6 37:16 38:1,8
  38:14,18 39:2,10
  43:11,21 44:5 45:4
  46:14 47:10,15,20
  48:4,9,13 49:6
  50:2 52:17 53:4
  54:13 56:13 57:4
  57:14 58:11,17
  59:5,9,15,20 60:4
  60:13,17

**L**

large 52:6
largest 56:7,15,19
lawsuit 6:5 43:15
learn 28:2
leave 21:6

left 28:3
letter 36:18
let's 28:12 45:2 60:3
Liability 25:15
line 62:9,10 63:8
liquidator 21:21
  22:2 30:16,20
listed 32:6,8,13 37:2
  52:11
listing 62:9
long 5:17 7:10,15
  9:2 48:14
longer 58:7
look 13:6 19:20
  36:14 45:7,8,11
  49:1 50:13 57:7
lost 40:20
lot 8:1
L.L.P 2:13 3:16 62:2
L02CV4206 1:8

**M**

maintain 10:20 11:1
  11:3
majority 13:8
making 60:8
malpractice 13:11
  13:15 16:5,11,16
manager 8:16
mandated 11:4
manner 62:8
Manor 1:5 3:3 13:14
  14:13 31:9 37:11
  46:9,16 54:8 57:11
  57:19 58:5 62:4
  63:5
mark 27:15 28:15
marked 28:18 29:3
Maryland 1:2,13
  2:15,21 3:18 10:17
  22:8,13 26:8 35:7
  41:11,13 58:7 62:3
  64:19
material 14:7 19:19
  48:21
materials 14:8 39:19
matter 35:8
ma'am 40:6 53:18
mean 7:5 22:5,10
  23:11,14 39:20
  55:8,16
medical 13:10,14
  16:5,11,16
meeting 4:16 22:19
  23:2,6,21 24:5

meetings 23:5,8,11
  23:14,16,17 26:10
  53:13 54:1,5,7,11
  54:15
member 22:16 44:4
  48:1,14,17
members 12:9 49:14
  52:1 53:10
memo 49:13 55:2,5
  55:8,12,16
memory 27:3
mentioned 15:20
Mezzanotte 3:21
Mezzanotte 6:19
  15:12 16:8 17:13
  18:1,9,12 19:4,11
  20:3,8 21:3,6
  23:10 24:19 25:13
  25:19 26:3 27:1,12
  27:17 28:12 29:12
  29:17 32:12 33:3,7
  34:9 35:1,6 37:13
  37:19 38:4,12,16
  38:19 39:7,12 40:5
  40:8,11,16,18 41:2
  43:19 44:2,10
  46:12 47:6,13,18
  48:3,6,11 49:3
  50:1 52:15,20 54:9
  56:10,21 57:13
  58:8,14 59:2,7,13
  59:17 60:1,7,14,15
  60:19 62:1
Midland 25:16
million 14:3
mind 62:7
minute 21:4 39:12
minutes 30:8 54:14
  54:16
Mission 25:17,17
money 16:15 17:19
  19:7,21 20:15,18
  21:16,21 22:2
  30:17 35:10 51:13
monthly 8:2 15:5,11
  16:2 20:11
months 44:20
motor 47:4,8,11
  50:9
move 27:14,18 28:12
Mutual 25:15,15,17
mysterious 27:21

**N**

N 4:1,1

# Deborah Price

name 5:8 15:9 18:20
  25:10 44:6 63:5,6
named 14:13
names 25:3
National 22:16,20
  23:2 25:17
NCIGF 23:9,12,15
  23:17 24:1
necessarily 50:15
necessary 45:6,13
  62:9
need 6:15,19 36:1
  42:20
needed 51:13 52:8
negotiable 18:13
neither 64:11
never 44:17,17
new 24:6 28:2
NORTHERN 1:3
NORTHWEST 63:1
Nos 28:17
notary 2:21 5:5 64:1
  64:19
notice 2:19 4:15 32:2
  36:18 44:11 49:10
  52:14
number 15:1,7 32:6
  37:1
numbers 62:10
nursing 13:10

**O**

O 4:1
object 15:13 16:8
  34:9
objected 44:17
objection 17:13 18:1
  19:11 20:3 23:10
  25:13 26:1 29:12
  29:17 32:12 33:3
  37:13,19 46:12
  47:6,13,18 48:3,6
  50:1 52:15 54:9
  56:10,21 57:13
  58:8,14 59:2,7
objections 43:4
occur 45:14
occurs 46:21
office 14:9 19:19
  36:14 49:1
officer 64:3
offices 2:10
Oh 7:13
Ohio 3:6 41:18
Okay 6:9,13,21

26:17 34:10 39:12
ones 59:14
operation 24:8,10,15
  25:5
oppress 42:5
order 60:16
ordered 62:13
organization 7:2
original 62:12,13,13
Orleans 24:6
outcome 64:17
oversee 7:21

**P**

page 4:2,9 32:1
  36:15 49:9,13,16
  49:18 52:11 54:20
  55:12,19 62:9,10
  62:12 63:8
Pages 1:9
paid 13:17,21 14:12
  15:2 30:17 33:16
  33:21 34:1,6,20
  35:4,14 36:7 50:14
  52:12 53:5 56:2
part 11:2 31:20
particular 51:3,14
  51:14
parties 64:13,16
Paul 3:17 62:2
Pause 21:18 22:3
  25:6
pay 16:16 17:10,20
  19:8 33:11 45:9
  49:20 50:5 51:13
paying 32:15 33:1
  35:10,12 37:9
payment 56:3
payments 45:9
pays 16:5
PCI 30:17
PCIGC 7:5 30:17,20
  37:8
Pennsylvania 2:14
people 9:21 10:7
  25:3 42:1
period 34:11,16
person 39:5 43:16
personal 38:10 39:4
  43:13
persons 38:9 39:3
  43:13
pertaining 6:5
Petr 8:6 24:4 25:6
  46:6,7 58:20

PHICO 11:10 12:1,9
  13:4,8,14,18 14:1
  15:1,2,3 16:5
  17:10,20 19:8,9
  20:1 22:2 25:9,14
  34:12 35:5,11
  46:10,15 47:11
  48:14 54:3,6 56:7
PHICO's 19:10
Plaintiff 1:6 3:3 5:4
  4:13
Plaintiff's 4:13
  31:17
plan 24:8,9,15 25:5
play 36:2
please 5:8 25:12
  27:16 35:3 36:16
  38:14 40:20 51:11
  54:21
point 9:1 25:19,20
  26:12,16 27:3
  60:13
policies 15:3 46:16
  46:20 47:12
policy 13:14 14:14
  16:6
policyholder 46:10
  58:6
position 35:8
positions 8:12
possible 35:21
preparation 24:15
prepare 24:7 55:5
  62:9
prepared 14:19 16:1
  24:11
present 33:17,18
  34:8,9,19 35:15
  56:9
presented 11:9
  37:11
presently 9:21
President 8:8
Preston 2:13 3:16
  62:2
pretty 15:12
previous 17:15
  18:17 44:11 49:16
  50:20 51:21 53:7
Price 1:12 2:9 4:2,9
  5:2,9 28:17,21
  29:2,3 39:6 43:19
  62:1 63:6
primarily 59:6
prior 35:7

privileged 54:12
probably 7:17 49:3
probe 35:19
problem 44:21 45:1
proceedings 64:4
process 44:2 45:5
  58:1
produced 20:21
  43:18
Production 4:14
  31:17
programming 8:1
project 8:18
projects 7:21
prolonged 43:4
proper 18:9
Property 1:8 3:14
  4:11 5:15 62:4
  63:5
provide 20:11 39:16
  43:2 44:18
provided 29:8,11,16
  31:14 43:7 48:1
  62:6
Public 2:21 64:1,19
pull 43:7
purpose 62:7
pursuant 2:19 10:17
P-E-T-R 8:6
P-H-I-C-O 11:10
p.m 1:15 2:7 61:2

**Q**

quarterly 15:5,11
  16:2,3 20:13
question 15:12
  17:16,18 18:2,16
  18:18 20:4 27:2
  29:13,18 34:14,18
  36:5 39:13,14 43:9
  44:8 50:4 55:20
  58:9,13,15,21
questions 6:4,6
  28:10 42:1 59:18
  60:10
quick 60:2
quite 44:14

**R**

R 3:8
raise 43:3
raised 42:9
raising 41:8
read 6:8 17:15 18:15
  18:17 29:12,17

31:9 39:19 40:19
  41:1 54:16 60:14
reading 29:21
real 60:2
really 11:20 28:3
  40:4 59:20
reason 50:18
received 7:17 21:21
  22:1,4 30:16 31:1
receiver 21:13
reconciliations
  43:18
record 6:9,13 21:4,5
  28:16 41:1 45:2,3
  49:4 64:10
recoveries 21:13
reduced 64:8
reference 14:7,8
  19:19 48:21 57:8
reflect 40:9
reflected 52:13
reflects 49:15
refund 48:1 52:1,4
regularly 23:8 53:20
  53:21
reimbursed 30:19
reimbursement
  30:16
related 13:10 64:12
relates 35:16
relative 64:11
relevant 34:10 47:7
Reliance 25:16 59:6
remember 12:1,5
  13:2 22:3 26:19
  57:9
repeat 22:9 51:8,11
rephrase 6:7
report 8:9 14:19
  15:6,9,18
Reported 1:20
reporter 2:20 6:8
  17:15 18:17 28:15
  40:2,7,10,12,17
  41:1 42:12 64:1,3
reports 15:18,19
  16:1
Request 4:13 31:17
requested 62:6
requires 39:19
reserve 56:9,15,20
reserves 45:7
residence 5:10
resident 26:8 35:7
  41:13,18 58:7
resolve 45:1

# Deborah Price

respond 41:3
responded 38:12 60:15
response 4:11 31:16 39:8,16 43:17 44:6
responses 6:11
responsibilities 10:19
responsibility 11:2 27:6 47:1
responsible 10:4 32:11 46:20
result 11:10 14:1 17:5 35:5 47:17
revenues 30:9
review 62:7,7
reviewed 29:7 46:15
reviewing 46:20
revise 62:8
ridiculous 38:7
right 6:17 11:6 16:12 18:7 39:7 40:14 59:13
Rockwood 25:18
room 42:11

**S**

S 4:1
Saint 3:17 62:2
sake 26:13
says 32:5 44:14 55:13
scared 28:6
screaming 40:3,15 40:16
second 49:18 52:11
security 9:6,7,8
see 54:14
seen 29:4 54:17
sense 51:7,10
sent 62:12
SERVES 63:1
set 31:14
settle 51:6
Seven 3:17 62:2
seventh 54:20
sheet 62:9,11,12 63:4
Shorthand 2:20 64:1 64:3
show 49:2
shushing 39:21
sign 60:14
signature 61:1 62:7 62:12 63:19

signed 29:5 62:11,12
silence 28:5
similar 55:12
simple 26:7
simply 41:7
Simultaneous 26:2 26:21 34:21 38:13 38:15 39:9
single 29:13,18
sir 25:20 28:7 35:17 40:2
sit 28:5 36:3
Soon 8:17
sorry 17:14 22:9 40:4,8 50:4 51:8 57:8
source 30:9
sources 21:12,16
speaking 26:2,21 34:21 38:13,15 39:9
specifically 43:15
speculate 39:20 59:3
spend 42:20
stand 42:7
standing 21:7
stare 36:3
staring 28:6
start 51:3
started 8:17 46:2,5,7
state 2:21 5:8 22:7 22:12 26:8 41:13 43:11 58:7 64:19
stated 20:9
statement 15:4
STATES 1:1
statute 10:17 41:12 41:15 45:18
statutory 11:4
stenotype 64:8
stony 28:5
Street 3:5,17 62:2 63:1
studies 9:15
stumble 35:20
stunt 43:8
subject 42:8 59:10
subjected 40:3,15
subjecting 42:14
submitted 38:19
SUITE 63:2
summary 20:11
supposed 28:6
Sure 56:17
surety 8:15 12:18

surplus 53:7
sworn 5:4 64:6
system 7:9,12,13,15 7:19 8:11

**T**

T 4:1,1
take 6:15 32:20 40:9 40:13 60:1,19
taken 5:19 16:6 64:4 64:7,14
talk 6:19
talked 49:10 52:18
talking 18:5,5
tape 40:14,18 60:18
Taylor 2:13 3:16 62:2
tell 7:19 11:8,21 12:4,7 13:20 14:8 17:8 19:14,18 21:1 21:16 26:16 27:2 27:13,18 33:13 34:3 35:21 36:13 53:3 59:14 60:10
telling 27:12
Ten 10:2
term 18:10,14
terms 56:9,15,20
testified 5:5 6:1
testimony 64:5,7,10
Thank 40:17
thing 27:7 35:15
things 26:11 27:7 41:8,19 42:21
think 9:3 35:19 47:3 49:5 52:17,18
thirty 62:13
thorough 30:3
thought 40:21
three 9:3 56:14
Thursday 1:14 2:6 63:6
till 27:13 33:17,18
time 6:16 23:1 26:12 27:8,9 34:17 35:9 37:9 41:12 42:20 42:21 47:3,16,21 56:9 59:10 62:6
title 7:1,7,17 8:7 12:19 47:17 49:20 50:5 52:18
today 6:13 10:9 17:11,21 19:10 29:8 43:18 44:7
told 30:8

Toledo 3:6 44:7
top 11:12,20 12:4,7 14:9 19:13 21:1 22:3 32:5 33:13 34:3 36:10,21 53:2 56:14 57:2,9
totally 34:13 42:4,4 42:17
Towson 2:15
train 40:20
transcript 4:8 28:19 59:21 60:16 62:6 62:12,14
Transit 25:14
travel 44:7
tried 41:3 43:2
true 30:2 33:6,7 64:10
truth 43:10
try 6:11 17:18
trying 42:16 43:7 51:12 52:7
two 10:7,10 14:12
types 10:15
typewriting 64:9

**U**

Um-hum 6:10,14 55:4
understand 6:6 18:2
Union 9:1
UNITED 1:1
University 9:13
updated 24:11
updates 25:1
updating 25:4
use 18:7,9,13,20
usually 52:3

**V**

v 1:7 62:4 63:5
vague 15:13 39:17
Valerie 10:5
vehicle 47:4,8,12 50:9
verbal 6:11
versus 37:11
Vice 8:8
voice 42:9

**W**

W 2:14
Wait 39:12
waived 61:1
Walinski 3:4

want 15:7 21:6 25:10 26:1,14 28:8 36:2 38:21 42:19 43:7 60:8,17
wants 60:16
WASHINGTON 63:2
wasn't 34:11 35:10
wasting 26:11 27:8
way 8:18 25:20 27:20 35:21 39:21 41:3
Westmoreland 25:18
we'll 6:16,20 45:1 59:9
we're 26:17 28:4 60:4,5
we've 12:11,15 34:15
Whiteford 2:13 3:16 62:2
wish 29:10,15 30:5
witness 5:3 19:5,13 24:20 25:14 28:11 29:19 32:13 37:14 42:8,15 43:18 46:13 47:14 53:2 56:12 57:2 58:10 58:16 59:8,11 63:6 64:5,7,11
witnesses 21:11
Witness's 42:21
word 18:8 29:13,18
work 7:2 8:2,20 9:2 9:5 10:13 59:14 60:2,6,9,11 9:18
Workers 12:12,14 12:17,19,20 13:3,4 32:15 37:5,9
write 13:4
written 41:15
wrote 13:14 37:5

**Y**

Yeah 26:3 38:12
year 12:5,7 16:21 17:1,3 45:10 49:21 50:7,15,16,20 51:7 51:15,21 52:13 53:7 55:13 56:19
years 5:18 7:18 9:4 10:7,10 12:6,12,16

13:1 28:1 34:1
46:10
**year's** 45:8

---
**1**
**1** 4:10 27:16 28:17
29:3,21 31:6,8
38:8 39:2 43:12,17
44:7,14 64:21
**1-64** 1:9
**1:35** 1:15 2:7
**10** 7:18 63:6
**100** 11:15
**1000** 5:12
**1020** 63:1
**11** 1:14 2:6
**12** 7:18
**15** 62:10
**15th** 36:19
**153873** 1:21 63:7
**16** 55:6
**16th** 55:3
**17** 5:18
**19TH** 63:1
**1986** 45:17 46:5
**1991** 9:17
**1993** 4:18 32:3,11,18
33:2,12,17,18 34:8
34:11,15 36:8
46:10 48:18 49:11
**1994** 36:19 37:7 56:5
**1995** 55:10 56:3
**1996** 55:3,6,14,17
**1997** 34:11,15 35:15
36:9 46:11 55:19
55:21
**1998** 35:8

---
**2**
**2** 4:11 28:17 30:13
31:15
**2:50** 61:2
**20** 28:1
**200** 11:17
**2002** 17:5
**2003** 1:14 2:6 17:5
23:4,6,21 63:6
**20036** 63:2
**2004** 17:7
**2005** 64:21
**202** 5:12
**210** 2:14
**21202-1626** 3:18
62:3
**21204-4515** 2:15

**21237** 5:13
**28** 4:10,14,18

---
**3**
**3** 4:15 28:18 31:13
31:13,20 32:1
36:16 49:7,18
52:11,14 54:21
**30** 62:13

---
**4**
**410-347-9471** 3:19
**410-832-2000** 2:16
**419-241-1200** 3:7
**43624** 3:6

---
**5**
**5** 4:3
**50** 11:13
**500** 11:19

---
**6**
**620** 63:2

---
**8**
**8** 4:17 62:10
**86** 45:21

---
**9**
**900** 3:5
**96** 56:3
**97** 34:12,13 56:3